UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                              )
JOHNATHAN FOLEY,                              )
                                              )
            Plaintiff,                        )
                                              )
v.                                            )            Civil Action No. 1:13-CV-12107-LTS
                                              )
WELLS FARGO, N.A.,                            )
s/h/m to Wachovia Mortgage FSB,               )
f/k/a World Savings FSB,                      )
                                              )
            Defendants.                       )
_____              )


ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 180)

May 1, 2017

SOROKIN, J.

        Plaintiff Johnathan Foley sued Defendant Wells Fargo for failure to consider him

for a mortgage loan modification in accordance with an approved Class Action Settlement

Agreement. Foley alleges breach of contract, violation of Massachusetts General Laws Chapter

93A, and breach of the implied covenants of good faith and fair dealing. Wells Fargo has moved

for summary judgment on all claims (Counts I, III, and IV). Doc. No. 180. The Court ALLOWS

Wells Fargo's Motion for Summary Judgment on Counts I, III, and IV of the Amended

Complaint and DISMISSES this action.

FACTS

        The parties and the Court are familiar with the background of this case. *See Foley v.*

*Wells Fargo, N.A.*, 772 F.3d 63 (1st Cir. 2014). A brief summary of the parties' relationship,

largely derived from the stipulated facts, Doc. No. 201, and Foley's affidavit, Doc. No. 59-3,

follows. Applying the familiar summary judgment standard, the Court draws all reasonable

inferences and resolves all disputed issues of material fact in Foley's favor. Further facts are discussed in the course of the analysis of Foley's claims.

On March 7, 2005, Jonathan Foley purchased a home for $650,000 at 61 Oceanside Drive, Unit 61, Hull, Massachusetts. Doc. No. 59-3 at ¶¶ 3-4. To finance the home, Foley obtained a $450,000 "Pick-a-Payment" mortgage from World Savings Bank, FSB requiring him to pay $1,670.42 a month. *Id*. at ¶¶ 4-6. Years later, World Savings Bank, FSB became Wells Fargo Bank, N.A. Doc. No. 201 at ¶¶ 2-3.

After the housing crash of 2008, the value of Foley's home dropped significantly. Doc. No. 59-3 at ¶ 6. Shortly thereafter, he also lost his job. *Id*. at ¶ 7. Despite these hardships, he continued to make his monthly mortgage payments until depleting his savings in October 2010. *Id.* at ¶ 7-11. Over the next several months, Foley failed to deliver full and timely monthly mortgage payments. Doc. No. 201 at ¶¶ 6-7.

Subsequently, in December 2010, Wells Fargo entered a Settlement Agreement to resolve an ongoing California class action lawsuit over the Pick-a-Payment mortgage loan scheme. *Id*. at ¶ 9. The class action Plaintiffs alleged the Pick-a-Payment loans violated the Truth-in-Lending Act, California unfair competition and consumer protection laws, and implied covenants of good faith and fair dealing because the loans failed to adequately disclose certain loan conditions to borrowers, such as interest rates and payment schedules. Doc. No. 81-2, Ex. A at ¶ 2. The parties reached a nationwide settlement. Foley was a member of "Settlement Class B" under the terms of the Settlement Agreement. Doc. No. 201 at ¶ 10. As a Class B Member, Foley was entitled to be <u>considered</u> for a Home Affordable Modification Program ("HAMP") loan and, if unqualified, to be <u>considered</u> for a MAP2R loan modification. Doc. No. 81-2, Ex. A at § VI(E)(5).

While HAMP is a government program with its own eligibility requirements, the MAP2R modification program was created by Wells Fargo specifically for the purposes of the Settlement Agreement. *Id*. at § VI(E)(1). To be eligible for a MAP2R modification, the bank inputs several variables into a determination process, known as the MAP2R Waterfall. *Id*. at § VI(E)(5). If the bank follows the Waterfall and cannot reduce the borrower's debt-to-income ratio to 31%, then it is not required to offer a MAP2R modification. *Id*. If denied for either a HAMP or MAP2R modification, the Settlement Agreement requires Wells Fargo to notify the applicant of the decision with "a written explanation." *Id*. at § VI(E)(8)(d).

On January 28, 2011, the Court-approved Class Action Notice was sent via first class mail to Foley. Doc. No. 201 at ¶ 22. The Settlement became officially effective in September 2011 and Wells Fargo sent Foley a request for mortgage assistance ("RMA") packet in November 2011. Doc. No. 201 at ¶ 24-26. In January 2012, Wells Fargo sent a letter denying Foley's request for mortgage assistance because he had not provided the documents necessary for consideration. *Id*. at ¶ 28. In August 2012, the bank sent Foley a notice of foreclosure. Doc. No. 59-3 at ¶ 18.

Throughout this time, Foley alleges that he repeatedly attempted to contact the bank and re-submit the necessary information, but was met with silence, misinformation, and general incompetence on the part of Wells Fargo. Doc. No. 59. at ¶¶ 19-26; Doc. No. 201 at ¶¶ 26-28. After being told by a bank employee that his loan modification application was either lost or never received, Foley was sent a new RMA in December 2012 that was eventually processed in February 2013. Doc. No. 185 at ¶¶ 4-11; Doc. No. 201 at ¶ 31. Wells Fargo sent Foley two letters in response to this RMA. Doc. No. 186-13; Doc. No. 186-14. The first letter, dated February 18, explained his ineligibility for HAMP because his "proposed modified monthly

payment amount would be more than 42%" of his gross monthly income. Doc. No. 186-13 at 2. The second letter, dated February 19, also denied him for an unspecified "number of mortgage assistance options" due to "excessive financial obligations" without any direct mention of the MAP2R program. Doc. No. 186-14 at 2. On April 5, 2013, Foley received a Notice of Foreclosure with a foreclosure date of May 8, 2013. Doc. No. 59-3 at ¶ 28. Convinced that Wells Fargo was wrongfully attempting to foreclose on his home, Foley, on April 8, 2013, sought assistance from the Massachusetts Attorney General's Office ("AG's Office"). Doc. No. 59-3 at ¶ 30; Doc. No. 201 at ¶ 43. The AG's Office then contacted Wells Fargo and suggested that, due to a change in Foley's financial situation, he may now be eligible for a loan modification. *Id*. at ¶¶ 43-44. In light of this new information, the bank postponed foreclosure and sent Foley a new RMA application in May 2013. *Id*. at ¶ 46.

Wells Fargo processed the second RMA application from Foley on June 27, 2013. Doc. No. 185 at ¶¶ 8-11. Foley was once again found ineligible for HAMP and MAP2R. *Id*. Wells Fargo sent Foley two denial letters on June 27, 2013, nearly identical to the two February denial letters. Doc. No. 201 at ¶¶ 56-57. One letter specified that Foley's "proposed modified monthly payment amount would be more than 42%" of his gross monthly income thus making him ineligible for HAMP. Doc. No. 186-13 at 2. The second letter contained no express mention of MAP2R or any calculation, but denied him for a "number of mortgage assistance options" due to "excessive financial obligations." Doc. No. 186-23 at 2. Foley found these written explanations insufficient and contacted the AG's Office once more while Wells Fargo resumed foreclosure proceedings. Doc. No. 59-3. at ¶ 46-47. On July 16, 2013, the AG's Office wrote to Wells Fargo a second time via email requesting the bank clarify under which specific programs it had evaluated Foley's application. Doc. No. 201 at ¶ 58. On July 17, 2013, a bank representative,

Justin Forbes, then called Foley to clarify his loan modification denials. Doc. No. 201 at ¶ 59. As discussed in greater detail below, Forbes explained unequivocally that Foley failed to qualify for the MAP2R program due to an "excessive forbearance." Doc. No. 184-10 at 6-8.

## PROCEDURAL HISTORY

Foley filed his initial Complaint against Wells Fargo pro se in Plymouth Superior Court on August 1, 2013. Doc. No. 1 at 1. The Complaint consisted of four counts. Count I alleged breach of contract; Count II alleged violation of M.G.L chapter 244, section 35A and 35B; Count III alleged violation of M.G.L. chapter 93A; and Count IV alleged breach of the implied covenants of good faith and fair dealing. *Id.*

Wells Fargo removed the case to federal court. Doc. No. 1. Thereafter, Judge Saylor denied a preliminary injunction and subsequently dismissed the case. Doc. No. 32; Doc. No. 34. Foley appealed. Doc. No. 36. The First Circuit reversed the dismissal of Counts I and IV of the Complaint. *See Foley*, 772 F.3d 63. After remand, Foley amended the Complaint to reinstate Count II's unfair trade practices claim and Count III's 93A claim. Doc. No. 59. Wells Fargo filed a Motion to Dismiss Counts II and III, Doc. No. 85, and a Motion to Transfer to the Northern District of California, Doc. No. 80. Foley filed a Motion for a Preliminary Injunction preventing Wells Fargo from foreclosing on his home. Doc. No. 64. The Court denied the Motion to Transfer, allowed the Motion to Dismiss as to Count II, denied the Motion to Dismiss as to Count III, and entered a preliminary injunction enjoining foreclosure pending the litigation.[1]

---

[1] Wells Fargo subsequently served foreclosure papers on Foley in violation of the injunction. See Doc. No. 198 at 10. Wells Fargo admits that the foreclosure notice was sent. Doc. No. 200 at 9. Foley never filed a motion seeking relief and the issue was apparently resolved at a status conference. See Doc. No. 149. As there is nothing in the summary judgment record about the incident and certainly nothing suggesting that the violation was willful, the Court will not consider the violation further.

Doc. No. 109. Presently before the Court is Wells Fargo's motion for summary judgment on Counts I, III, and IV of the Amended Complaint. Doc. No. 180.

STANDARD OF REVIEW

Summary judgment shall be granted when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, Wells Fargo bears the burden of demonstrating the absence of a genuine issue of material fact essential to Foley's case at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court views the facts in the light most favorable to the non-moving party, Foley. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

DISCUSSION

A. Count I: Breach of Contract

In Count I of the Amended Complaint, Foley alleges a breach of contract arising from Wells Fargo's supposed failure to: (a) consider him for a MAP2R modification of his loan under the terms of the Settlement Agreement; and (b) to explain clearly the basis for his denial. The contract at issue is the Class Settlement Agreement, which is governed by California law. *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 76 (1st Cir. 2014). The elements of this claim are clear and were set forth by the First Circuit. *See id.* In order to survive Wells Fargo's motion for summary judgment, Foley must demonstrate: "1) the existence of a contract; 2) [his] performance or excuse for non-performance; 3) [Wells Fargo's] breach; 4) and resulting damages to [him]" *Id.* (citing *Bellevue v. Prudential Ins. Co. of Am.*, 23 F. App'x 809, 810-11) (9th Cir. 2001).

1. Failure to Consider Foley for a MAP2R Modification

The Court discerns three possible theories advanced by Foley as to how Wells Fargo failed to consider him for a MAP2R loan modification in accordance with the terms of the Settlement Agreement: first, that the bank failed to consider him for an MAP2R modification generally; second, that it utilized an incorrect formula in the MAP2R Waterfall; and third, that it made an error in its final calculation. Ultimately these theories fail and Wells Fargo has demonstrated that it is entitled to judgment as a matter of law.

a. Full Consideration for a Loan Modification

As a Settlement Class B Member, Wells Fargo was required to consider Foley for a HAMP loan modification. Doc. No. 81-2, Ex. A at § VI(E)(5). Additionally, if Foley did not qualify for or elect to accept the HAMP modification, Wells Fargo was required to consider him for a MAP2R loan modification. *Id*. The Agreement made clear that "there is no obligation for [Wells Fargo] to offer MAP2R Modifications to Settlement Class Members who cannot be qualified under the HAMP or MAP2R guidelines." *Id.*

In February 2013, Foley's application for a HAMP modification was first processed by Wells Fargo. Doc. No. 185 at ¶ 4. After determining his ineligibility for HAMP, Foley was then considered for a MAP2R modification. Doc. No. 185 at ¶¶ 6-7. In June 2013, Foley resubmitted an application to be reconsidered for both programs and was once again denied. Doc. No. 201 at ¶ 51. He received letters of denial on both occasions, although neither expressly mentioned the MAP2R modification program. *Id.* at ¶¶ 40-41, 56-57. An affidavit from Elizabeth Nickel, Wells Fargo's Vice President of Loan Documentation, describes the processing and subsequent

analysis of each of Foley's modification applications in detail.[2] Doc. No. 185 at ¶¶ 4-11. Specifically, Nickel identified the information input into the HAMP and MAP2R Waterfalls and the corresponding results. *Id.* An additional affidavit provided by Michael Dolan, a Wells Fargo Operations Analyst, further explains that the applications were denied because the proposed modified monthly mortgage payments were in excess of the required percentages of Foley's gross monthly income. Doc. No. 21 at ¶¶ 19, 27. Subsequently, in two separate recorded telephone calls dated July 17, 2013, and July 23, 2013, a Wells Fargo customer service representative, Justin Forbes, expressly advised Foley that the bank considered him for the MAP2R modification and that he was denied due to an "excessive forbearance." Doc. No. 184-10 at 7-8, 14-15.

The July 30, 2013 letter sent in response to the email inquiry made by the AG's Office also clearly addressed Foley's ineligibility for both the HAMP and MAP2R modifications. Doc. No. 83-19 at 2. To be eligible for a HAMP modification, the proposed modified monthly payment must be no more than 42% of an individual's monthly gross income. *Id.* Foley's proposed payment was 58.03% and thus properly denied. *Id.* The MAP2R modification attempts to reduce the borrower's monthly mortgage payment to 31% of the borrower's gross monthly income. Doc. No. 81-2, Ex. A at § VI(E)(5). However, as the letter expressly states, Wells Fargo

---

[2] Insofar as Foley asserts that bank officials may not offer affidavits describing the business activities of the bank conducted in the ordinary course regarding his loan modification requests without personal knowledge, his argument is misplaced. *E.g.,* Doc. No. 201 ¶¶ 36-37. Precedent clearly establishes otherwise.
*See e.g. Brown v. Bank of Am.*, No. CV 13-13256-PBS, 2015 WL 5163045, at *3 (D. Mass. Sept. 3, 2015) (denying motion to strike bank employee affidavit based on argument that the employee lacked personal knowledge); *Leonard v. PNC Bank, NA*, No. CIV.A. 11-11815-NMG, 2014 WL 458041, at *2 (D. Mass. Feb. 3, 2014) (holding there is "nothing inappropriate" about a bank's reliance on an employee to present documents "in such a manner"); *Santander Bank, Nat. Ass'n v. Sturgis*, No. CIV.A. 11-10601-DPW, 2013 WL 6046012, at *12 (D. Mass. Nov. 13, 2013) (finding bank employee to be a "qualified witness" where she had personal knowledge based upon review of the bank's records).

was unable to formulate a housing payment for Foley in accordance with the required gross monthly income. Doc. No. 83-19 at 2.

Not only has Foley admitted most of this evidence, he offers no evidence demonstrating that Wells Fargo failed to fully consider him for a loan modification.[3] *See* Doc. No. 201 at ¶¶ 4-75. While his unverified Amended Complaint alleges that Wells Fargo never provided or performed any of the relief under the Settlement Agreement, "unverified allegations in a complaint are not evidence." *Geshke v. Crocs, Inc.*, 740 F. 3d 74, 78 n.3 (1st Cir. 2014). His affidavit certainly gives examples of Wells Fargo not returning his calls and providing confusing or incorrect information. However, it does not offer any insight concerning the application determination process itself. *See generally* Doc. No. 59-3. The Settlement Agreement required Wells Fargo to process Foley's application in order to determine his eligibility for a loan modification. Doc. No. 81-2, Ex. A at § VI(E)(5). The undisputed evidence establishes that Wells Fargo fulfilled that obligation.

b. Misapplication of MAP2R Formula

Next, Foley argues that, in determining whether he was eligible for a MAP2R modification, there is a material dispute of fact as to whether Wells Fargo applied the debt-to-income ratio ("DTI") or a housing-to-income ratio ("HTI"). On all matters in this case governing loan modification and the parties' respective calculations, the Settlement Agreement controls. The MAP2R modification program aims "to reduce a Settlement Class Member's DTI to 31% or less . . . . [O]nce the DTI of 31% is reached, the loan will be converted to a fully-amortizing loan and the negative amortization feature will be eliminated." Doc. No. 81-2, Ex. B at § III(C)(2). The Agreement expressly defines DTI as the ratio of the applicant's first-lien monthly mortgage

---

[3] The Court notes that Foley has had a full and fair opportunity to take discovery in this case in order to test Wells Fargo's evidence.

obligations, "*including monthly amounts for principal, interest, property taxes, hazard insurance, flood insurance, condominium association fees, and homeowners' association fees*" to the applicant's gross monthly income. Doc. No. 81-2, Ex. A at § I(1.22) (emphasis added). At no point in the Agreement is there a mention of an HTI ratio, but the undisputed evidence establishes that the HTI applied by Wells Fargo is identical to the DTI as defined in the Agreement. The only definition of HTI in the record is provided in the Elizabeth Nickel affidavit. Nickel defines HTI as "the ratio between a borrower's monthly mortgage payment (*including principal, interest, taxes, hazard insurance, and homeowner's insurance/condominium fees*) and the borrower's monthly gross income." Doc. No. 185 at ¶ 12 (emphasis added). She goes on to explain that this is the formula Wells Fargo applied when it considered Foley for a MAP2R loan modification. *Id.* at ¶ 7. Thus, the record demonstrates that HTI, in this case, is just another acronym for DTI.

Ultimately, Foley has offered no factual evidence to support his claim that Wells Fargo miscalculated the DTI (or HTI) ratio. Absent such a record, Foley cannot maintain that a material question of fact exists concerning his breach of contract claim.

c. The MAP2R Calculation

Additionally, Foley offers his own personal calculation to determine his eligibility for MAP2R that reaches a different conclusion than the Wells Fargo's calculation. The following table represent the two parties' respective calculations:

| | **Foley MAP2R Calculation**[4] | **Wells Fargo MAP2R Calculation**[5] |
|---|---|---|
| a. Current Outstanding Loan Balance as of 10/07/13 | $516,490.63 | $516,490.63 |

[4] Doc. No. 184-12 at 3.
[5] Doc. No. 181 at 9.

| | | |
|---|---|---|
| b. Monthly Gross Income of Borrower | $5,783.00 | $5,783.00[6] |
| c. Allowable term and interest rate | 40 years at 2% | 40 years at 2% |
| d. Required Debt to Income Ratio "DTI" for Modification | 31% | 31% |
| e. Thus, in order for a modification to occur, the monthly mortgage payment must be less than or equal to: | $1,792.73 | $1,792.73 |
| f. Using the Allowable Interest & Term (c), based on full amount of $516,490.63 (a), the monthly mortgage payment would be: | $1,564.07 (27% DTI) Mortgage only | $1,564.07 (27 % DTI) Mortgage only<br><br>$2,594.56 (44.9% DTI) With Insurance, Homeowners' Association Fees, & Property Tax:<br><br>$2,086.07 (36%DTI) With Insurance & Homeowners' Association Fees Only |
| g. Using a $455,000 loan balance the mortgage payment would be: | $1,377.86 (23.8% DTI) Mortgage only | $1,377.86 (23.8% DTI) Mortgage only<br><br>$2,408.35 (41.7% DTI)[7] With Insurance, Homeowners' Association Fees, & Property Tax |

---

[6] Wells Fargo independently determined that Foley's verified gross income was $4,333.33. However, in their memorandum in support of summary judgment before the court, they conceded Foley's use of a higher income which still resulted in his clear ineligibility for the modification. *See id.*

[7] At the hearing on the summary judgment motion, for the first time, Foley argued that once he fell below a 42% DTI, then, under MAP2R, he was entitled to a reduction in principal which would result in a final qualifying calculation complying with the 31% requirement. There are several significant problems with this theory. First, Foley did not advance this theory in his papers rendering unfair consideration of it now. Second, he has not cited anything in the record establishing that, under MAP2R, below a 42% DTI Wells Fargo begins to consider a principal reduction. Third, he has not cited any evidence showing (even assuming his 42% argument) (a) that he would qualify for any principal under MAP2R and (b) that the amount of the reduction would bring him below the 31% qualification point. Fourth, even reaching the threshold 42% DTI requires applying a $455,000 principal basis (the original loan amount). Foley cites nothing in the record tending to show that that number is the correct starting point under MAP2R whereas Wells Fargo has submitted affidavits stating that it applied MAP2R and that the starting MAP2R number was $516,490.63. Under these circumstances, on summary judgment, the Wells Fargo number prevails. Finally, Foley's calculation assumes a monthly income of $5,783, but Wells Fargo determined that the proper amount under the Settlement Agreement was $4,333.33. Foley has not cited evidence showing that either calculation required the use of his higher income amount rather than Wells Fargo's lower verified amount.

| | | $1,899.86 (32.8% DTI) With Insurance & Homeowners' Association Fees Only: |
| --- | --- | --- |

As the chart clearly illustrates, Foley obtains a qualifying DTI only by excluding the cost of property taxes, homeowners' association fees, and home insurance. The Agreement, however, defines DTI as including first-lien monthly mortgage obligations and "monthly amounts for principal, interest, <u>property taxes</u>, hazard insurance, flood insurance, condominium association fees, and <u>homeowners' association fees</u>." Doc. No. 81-2, Ex. A at ¶ I, 1.22 (emphasis added). According to the June 2013 RMA, Foley has homeowners' association fees of $472 and homeowners' insurance of $50 that he must pay each month in addition to the principal and interest loan amount. Doc. No. 186-22 at 5.[8] As the chart demonstrates, when these amounts are included, as required by the Settlement Agreement, Foley fails to qualify for a MAP2R modification.

In his affidavit, Foley alternatively suggests that the loan balance may be even lower than $455,000, but he makes no reference as to what the amount may be. *See* Doc. No. 64-2 at 3, n.4. Without an evidentiary basis for a lower amount, Foley has failed to provide support for an inference that Wells Fargo incorrectly determined his eligibility for a loan modification.

2. Clear Explanation for the Basis of Denial

Next, Foley argues that Wells Fargo breached the Settlement Agreement by failing to clearly explain the basis for his denial. Section IV(E)(8)(d) of the Settlement Agreement requires

---

[8] In its memorandum in support of summary judgment, Wells Fargo includes property taxes of $508.49 in its calculations. Foley's June 2016 RMA, however, claims that he does not pay his property taxes. For the purposes of this opinion, the Court has calculated the DTI with and without property taxes. Under both methods, however, Foley fails to meet the 31% requirement. Doc. No. 181 at 9; Doc. No. 186-22 at 5.

Wells Fargo to provide those who do not "qualify for HAMP or MAP2R Modifications . . . with a written explanation" for any denial. Doc. No. 81-2, Ex. A at § VI(E)(8)(d). In particular, Foley complains that Wells Fargo never specifically said he was rejected for a MAP2R modification. The First Circuit, in this case, ruled that "Wells Fargo is correct that the settlement agreement did not per se require the bank to provide a denial letter specifically referencing MAP2R . . . [b]ut— assuming the bank reviewed Foley's MAP2R eligibility, as it claimed—the agreement did require Wells Fargo to clearly communicate to Foley, in writing and within thirty days, why he was denied for MAP2R." *Foley*, 772 F.3d at 76. This Wells Fargo told Foley. Moreover, even if the First Circuit's statement was a ruling on the sufficiency of the pleading allegations and not a binding interpretation of the Settlement Agreement. a de novo analysis reveals that the Settlement Agreement does not require specific reference to MAP2R.

Generally, under California law, contract terms are construed according to their ordinary and usual meaning unless an intent to interpret otherwise plainly appears. *See Cohn v. Cohn*, 123 P.2d 833, 833 (Cal. 1942). Considered in that light, the contract here merely required Wells Fargo to notify Foley of its denial and the corresponding reason.

It is beyond dispute that Wells Fargo sent Foley four denial letters to his Massachusetts address dated February 18, 2013, February 19, 2013, June 27, 2013, and July 30, 2013. *See* Doc. No. 201 at ¶¶ 40-41, 56-57.[9] This evidence establishes that Wells Fargo provided a written explanation in accordance with its obligations in the Settlement Agreement. For example, the February 18 letter explains that "Wells Fargo Home Mortgage is unable to offer you a modification under the federal government's Home Affordable Modification Program (HAMP)

---

[9] The record also contains another letter dated April 30, 2013 and erroneously addressed to "Hull, CA" instead of "Hull, MA." Doc. No. 186-17 at 2. There is no such place as Hull, CA. The letter addressed to Hull, CA bore a Massachusetts zip code. Foley denies that this letter ever reached him. Viewing the record most favorably to Foley, the Court accepts that Foley did not receive the letter.

because . . . your proposed modified monthly payment amount would be more than 42% of your monthly gross income (before taxes and deductions)." Doc. No. 186-13 at 2; Doc. No. 186-24 at 2. The next day, Foley received another letter explaining that "Wells Fargo Home Mortgage is unable to offer you a modification because you have excessive financial obligations," thus explaining why he did not qualify for MAP2R. Doc. No. 186-14 at 2. The June 2013 letters are nearly identical to these earlier written explanations. Doc. No. 186-23 at 2; Doc. No. 186-24 at 2. If there was any uncertainty left, the Wells Fargo July 30, 2013 letter sent to Foley in response to the AG's Office's inquiry elucidated that, "[u]nder the MAP2R guidelines, we were unable to sufficiently adjust the terms of the loan to achieve an affordable housing payment reflective of 34.00% [sic] of your gross monthly income."[10] Doc. No. 186-28. The letters told Foley clearly and unambiguously that he owed too much in light of his income to qualify for a loan modification. Thus, Wells Fargo's explanations satisfy its contractual obligations.

There is, however, a further consideration. Under California law, the test of extrinsic evidence admissibility is not concerned merely with a contract's ambiguity, but rather with "whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & Rigging Co.*, 442 P.2d 641, 644 (Cal. 1968) (in bank). In other words, courts are tasked to go beyond the mere text of a contract, even if written in unambiguous language, to determine what the parties intended. *See id.* (holding that "the intention of the parties as expressed in the contract is the source of contractual rights and duties. A court must ascertain and give effect to this

---

[10] The Parties agree that, while the letter said 34%, that figure is an error and the proper number was 31%. However, the letter plainly indicated that Wells Fargo considered Foley for MAP2R and rejected his application. Because the error was in Foley's favor, it does not undermine this conclusion.

intention by determining what the parties meant by the words they used"). Applying this approach and considering the extrinsic evidence merely confirms the contract's plain meaning.

The exact language of the above provision of § IV(E)(8) was negotiated upon by the Lead Class Counsel and Wells Fargo during the Settlement negotiations. Doc. No. 184-9. Initially, Lead Class Counsel's proposal obliged Wells Fargo to provide those who did not meet the MAP2R requirements with:

> [A] written description, which shall be copied to Lead Class Counsel, detailing why they did not qualify for the modification. *The detail shall, at a minimum, indicate the basis of the denial, which shall include the following*: a) a negative NPV, and if so, the figures used to make that calculation; b) a DTI that was already below 31%, and if so, the figures used to make that calculation; c) the Settlement Class member rejected the modification proposal; d) the Settlement Class Member failed to provide necessary documents or failed to respond to communications from Defendants; or e) any other reason for denial.

*Id.* at 11 (emphasis added). This proposal was rejected and replaced with language requiring Wells Fargo to provide "a written description, which shall be copied to Lead Class Counsel, which *clearly explains the reasons that the modification was denied*." *Id.* at 23 (emphasis added). However, this specific language was again omitted from the signed Settlement Agreement. Instead, the final § IV(E)(8)(d) provision requires Wells Fargo to "[p]rovide Settlement Class Members who do not qualify for HAMP or MAP2R Modifications, within thirty (30) calendar days of the Defendants' receipt of all required documentation from the Settlement Class Member, *with a written explanation*." Doc. No. 81-2, Ex. A at § VI(E)(8).

Here, the only submitted evidence regarding the course of negotiations shows that Lead Class Counsel originally sought what Foley here demands; that the Bank provide a detailed explanation of the calculation and basis for denial. However, Lead Class Counsel relented on these demands resulting in the more general language with no express requirements. The

extrinsic evidence affirms the plain reading of the contract's language. Thus, the Settlement Agreement requires only a written explanation. This Wells Fargo provided.

B. Count III: Violation of M.G.L.c. 93A, § 9, Unfair Trade Practices

Foley next brings a claim under Chapter 93A, Massachusetts's consumer protection statute. Chapter 93A declares any "unfair or deceptive acts or practices in the conduct of any trade or commerce" that results in damage to be unlawful. Mass. Gen. Laws. ch., 93A § 2(a) (2004). The statute does not define unfair or deceptive, recognizing that "[t]here is no limit to human inventiveness in this field." *Kattar v. Demoulas*, 739 N.E.2d 246, 257 (Mass. 2000). Conduct may be deemed deceptive when it has "[t]he capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted." *Aspinall v. Philip Morris Cos.*, 813 N.E.2d 476, 486 (Mass. 2004). In assessing whether conduct is unfair, Courts generally will look to "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)." *Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F. 3d 47, 69 (1st Cir. 2009) (alterations in original). "Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact . . . the boundaries of what may qualify for consideration as a c. 93A violation is a question of law." *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 259 (Mass. 2008) (quoting *Schwanbeck v. Federal-Mogul Corp.*, 578 N.E.2d 789, 803-04 (Mass. 1991).

Foley argues Wells Fargo violated 93A in five different ways. Namely, that Wells Fargo: 1) never informed him of his rights under the Settlement Agreement; 2) ignored his requests for

good faith negotiations; 3) misguided and frustrated him through the process of loan modifications; 4) never intended to perform the contract; and 5) provided confusing and inconsistent information in its communications with him. Doc. No. 198 at 9-13. Ultimately, these arguments fail to establish a 93A violation.

    1.   Never Informing Foley of His Rights Under the Settlement Agreement

As per its obligation under § X(B)(1) of the Settlement Agreement, Wells Fargo sent Foley notice of the Class Settlement via first-class mail on January 28, 2011. Doc. No. 201 at ¶¶ 22-23. This notice clearly and unequivocally notified Foley of his rights under the Settlement. Doc. No. 183 at ¶ 6; Doc. No. 183-1 at 2-13. Foley does not dispute that he received this notice. Thus, this theory provides no basis to find that Wells Fargo engaged in any unfair or deceptive acts.

    2.   Ignoring Requests for Good Faith Negotiations

Foley advances a claim that Wells Fargo ignored requests for good faith negotiations. The Settlement Agreement does not require Wells Fargo to engage in negotiations with Class Members for a new mortgage agreement, unless qualified for a loan modification. Foley, however, did not qualify for a loan modification. Therefore, his 93A claim fails on this theory.

    3.   Misguiding and Frustrating the Loan Modification Process

Foley argues that Wells Fargo's handling of his loan modification application while trying to foreclose on the property "is an exposition of frustration and misguidance." Doc. No. 198. The record does not reveal any effort by the bank to prolong the loan modification process so they could foreclose on the property. Instead, the record demonstrates that Foley was rejected for loan modifications simply because he was not eligible.

4.  Never Intending to Perform Under the Settlement Agreement

As discussed above, Wells Fargo sent Foley the court-approved Settlement Notice, a Settlement Check of $178.04 cashed by Foley, and considered his loan modification applications. Doc. No. 183 at ¶ 6; Doc. No. 201 at ¶ 25. Wells Fargo performed its obligations.

5.  Communications with Foley

Finally, Foley contends Wells Fargo's conduct and communications with him amount to a 93A violation. In evaluating this theory, the Court considers the entire two-year history between the parties. *See e.g.*, Doc. No. 59-3; Doc. No. 201. On this point, Foley's affidavit contains examples of Wells Fargo representatives not returning his emails and phone messages, telling him they would call him back and not following through, and providing unclear and confusing information. Doc. No. 59-3 at ¶¶ 14-17, 26, 35, 46-49.

In 2014, the First Circuit noted that "the SJC has repeatedly held that 'mere negligence,' standing alone, is not sufficient for a violation of ch. 93A—something more is required." *Baker v. Goldman, Sachs & Co.*, 771 F.3d 37, 51 (1st Cir. 2014) (quoting *Klairmont v. Gainsboro Rest., Inc.*, 987 N.E.2d 1247, 1257 (Mass. 2013); *Darviris v. Petros*, 812 N.E.2d 1188, 1192 (Mass. 2004); *Swanson v. Bankers Life Co.*, 450 N.E.2d 577, 580 (Mass. 1983). Thus the *Baker* Court applied a legal standard of extreme or egregious conduct to find 93A § 11 liability. *See id.* (citing *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1032 (Mass. 2004)). More recently, the First Circuit observed that "inconsistent and confusing communications rendered the process all the more stressful. But [defendant's] allegations as to [plaintiff's] recordkeeping practices at most sound in negligence, and 'a negligent act or acts, alone, do not violate [Chapter 93A].'" *Young v. Wells Fargo Bank, N.A.*, 828 F. 3d 26, 34 (1st Cir. 2015) (quoting *Klairmont*, 987 N.E.2d at 1257) (third alteration in original).

The evidence offered by Foley, drawing all reasonable inferences in his favor, fails to nudge the matter from negligence to something more. Wells Fargo considered his modification applications, complied with the analysis set forth in the Settlement Agreement, provided the written explanations required by the Settlement Agreement, explained its reasoning in more detail on the phone, and postponed foreclosure pending resolution of the modification applications and later the legal proceedings. While the process was not painless with varying points of contact and unclear information relayed at times, Foley has nonetheless failed to demonstrate sufficient evidence to make out a 93A violation.

Also, like the plaintiff in *Young*, Foley cannot establish harm from the conduct related to the alleged 93A violation. As discussed in the breach of contract analysis, Wells Fargo was lawfully entitled to foreclose on his home. The filing of the lawsuit alone does not suffice to establish damages. *See id.* at 35 n.6 ("[W]e doubt that a Chapter 93A plaintiff can demonstrate injury based on legal expenses alone, especially as Chapter 93A separately provides for 'reasonable attorney's fees and costs incurred in connection with said action.'"). Therefore, Foley's claim that the quality of Wells Fargo's communications violates 93A fails.

C. Count IV: Breach of the Implied Covenants of Good Faith and Fair Dealing

Count IV of the Amended Complaint alleges a breach of the implied covenants of good faith and fair dealing imposed upon all contracts under California law. *See San Jose Production Credit Ass'n v. Old Republic Life Ins. Co.*, 723 F.2d 700, 703 (9th Cir. 1984). These covenants require contracting parties "to refrain from doing anything which would render performance of the contract impossible by any act of his own . . . [and] do everything that the contract presupposes that he will do to accomplish its purpose." *Hamm v. Frasher*, 5 Cal. Rptr. 367, 374 (Cal. Dist. Ct. App. 1960).

In support of his claim, Foley alleges Wells Fargo breached the implied covenants of good faith and fair dealing by sending letters with varying explanations sent the same day, entertaining tortured back and forth requests for supplemental information, and violating the 2016 restraining order. Doc. No. 198 at 14. He also argues that, if Wells Fargo intended to act in good faith, it would have had "competent representatives or written communications" explaining the loan modification programs and his subsequent denial. Doc. No. 59 at ¶ 80. Nonetheless, these arguments fail to demonstrate acts by Wells Fargo amounting to a breach of the implied covenants. *Id.* While the meaning of good faith and fair dealing depend on both the express contract terms and legitimate expectations of Foley, here neither were disregarded. *See Acree v. General Motors Acceptance Corp.*, 112 Cal. Rptr. 2d 99, 107-08 (Cal. Ct. App. 2001).

First, there is only one day on which Foley could allege that he received letters dated the same day with different reasons for the denials. On June 27, 2013, Foley received two letters, each serving a different purpose: one denying the HAMP modification and the other denying the MAP2R modification. Doc. No. 83-17; Doc. No. 83-18. The applications for both of the modifications were processed at the same time, making it entirely proper to send them at the time. Moreover, the letters contained slightly different reasons for denial because each letter explained the denial decision under different modification programs with different requirements.

Foley also claims a letter further explaining the loan modification denial dated April 30, 2013, sent to him at 61 Oceanside Drive, Hull, CA 02045, instead of 61 Oceanside Drive, Hull, MA 02045, is evidence of bad faith. Doc. No. 83-16 at 2. This letter was sent in response to an inquiry Foley made to the AG's Office concerning the February denial letters. However, there is no evidence that the error was anything other than random and inadvertent. Nor is there evidence of any harm flowing from the misaddressed letter. Absent evidence that the typo was the result

of something more than an honest mistake, there is no breach of the implied covenants. *See Careau & Co. v. Security Pacific Business Credit, Inc.*, 272 Cal. Rptr. 387, 399 (Cal. Ct. App. 1990) (holding that an honest mistake, bad judgment, or negligence does not constitute a breach of the implied covenants).

Next, Foley argues that Wells Fargo breached the implied covenants by engaging in tortured back and forth requests for supplemental information. However, the record reveals that the bank's requests for supplemental information were legitimate and necessary to determine his eligibility. On this point, there is no genuine dispute of material fact. Doc. No. 182-2; Doc. No. 184-1; Doc. No. 184-2; Doc. No. 184-3; Doc. No. 184-5; Doc. No. 186-3; Doc. No. 186-7; Doc. No. 201 at ¶¶ 26-29. Foley has cited nothing in the record demonstrating that any of these requests were in breach of the implied covenants other than the mere fact that these requests occurred.

Additionally, Foley argues that Wells Fargo breached the implied covenants by providing incompetent representatives, specifically noting a phone conversation with Wells Fargo representative, Justin Forbes on July 17, 2013. Doc. No. 59 at ¶ 80; Doc. No. 59-3 at ¶ 48. In his affidavit, Foley asserts that:

> I asked him [Forbes] whether I was considered for MAP2R and he said: no; then possibly; then MAP2R is the same as MAP so no difference. I told him I should be afforded MAP2R because the program requires [sic] specifically deals with 'Pick-A-Payment' loans and he informed me he will need to speak to the Wells Fargo legal department.

Doc. No. 59-3 at ¶ 48. In response, Wells Fargo submits a transcript of the phone conversation. Foley has not disputed the transcript's accuracy. It states:

FOLEY: The MAP2R is the same thing as the MAP?

FORBES: Right.

FOLEY: Okay. There's no difference at all?

FORBES: Nope.

. . .

FORBES: When we reviewed you for [MAP2R] we weren't able to approve you for it due to an excessive forbearance, meaning your debt-to-income ratio—

FOLEY: Okay, all right. So, you reviewed me for the MAP2R program, but you were not—so, you didn't review me for MAP2R because I was not able to enter MAP2R because of my excessive forbearance?

FORBES: We did review you. We were not able to approve you for the program due to an excessive forbearance, correct.

FOLEY: Okay. So, I was reviewed for MAP2R, and because of my excessive forbearance, I was rejected?

FORBES: Yes.

. . .

FOLEY: .But I'm asking specifically about the class-action settlement, about that. I thought there (inaudible) protections in place for the class-action settlement as settled by Wells Fargo, including the MAP2R program and including receiving information, including Wells Fargo sending me information about it and also receiving detailed rejection information. Do you know anything about that?

FORBES.: We can certainly research that with our legal team. You will need to provide more specific information than that regarding what parts of that class action settlement, and, you know, if you have specific verbiage from that settlement that you're basing that on, we can certainly have that reviewed by our legal team.

Doc. No. 184-10 at 6-9. The transcript of a July 23 conversation (again the transcript is

unchallenged) captures Forbes further explaining the denial to Foley once again:

FOLEY: I thought that I may be eligible for [MAP2R]. I read things about eligibility for it. I was never given anything from Wells Fargo or know about it, really, much of anything about it until I did my own investigation. So, that's what I was wondering if I was entered into. And you're telling me that I was formerly entered in the MAP2R and I got rejected from that as well.

FORBES: Correct, due to affordability. Like I said, you know, really, for either of those programs, we're trying to reach a target payment based on your debt-to-income ratio.

FOLEY: Yup.

FORBES: We were unable to do that with your gross monthly income, based on the financial information you submitted to us, so if there's any additional financial information you could submit to us, ideally that would, you know, allow us to use more income in that review. That's what we'd be looking for through that appeal.

FOLEY: Understood. So, okay. All right, thank you so much.

*Id.* at 14-15. Forbes explained unequivocally that MAP and MAP2R are the "same thing," and that Foley failed to qualify for the MAP2R program due to an "excessive forbearance." *Id.* at 6-8. Moreover, Forbes said the legal team would be consulted if Foley could point to what terms of the Settlement Agreement were being violated—which he could not. *Id.* at 9. Thus, Foley's claims do not give rise to a breach of the implied covenants.


CONCLUSION

Accordingly, Wells Fargo's Motion for Summary Judgment, Doc. No. 180, is ALLOWED as to Counts I, III, and IV, of Foley's Amended Complaint. Summary Judgment Doc. No. 180. As Foley has no other pending claims, this concludes the case. The parties shall file a joint status report within seven days proposing their joint or separate views as to the proper disposition of funds on deposit with the Court. The Preliminary Injunction, decided upon a different record, is VACATED.


SO ORDERED.

_/s/ Leo T. Sorokin_____
Leo T. Sorokin
United States District Judge